Skye Larazo (14071)
**RAY QUINNEY & NEBEKER, P.C.**
36 South State Street, Suite 1400
Salt Lake City, UT 84111
Telephone: 801-532-1500
Facsimile: 801-532-7543
slarazo@rqn.com

Trinity Jordan (15875)
Jacob R. Lee (17531)
**DENTONS DURHAM JONES PINEGAR, P.C.**
111 South Main Street, Suite 2400
Salt Lake City, Utah 84111
Telephone: (801) 415-3000
trinity.jordan@dentons.com
jake.lee@dentons.com

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARCEL MALU MALANGA, TYLER CHRISTIAN THOMPSON JR., BENJAMIN REUBEN ZALMAN-POLUN, and JOSEPH PETER MOESSER,<br><br>Defendants. | **MOTION TO DISMISS CASE DUE TO RIGHT TO COUNSEL, DUE PROCESS, AND EQUAL PROTECTION VIOLATIONS**<br><br>Case No. 2:25-cr-00153-RJS-DBP<br><br>Justice Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

Defendant Tyler Christian Thompson, Jr. ("Defendant" or "Mr. Thompson"), through counsel, moves the Court to dismiss the instant case against Mr. Thompson due to the violation of Mr. Thompson's Fifth and Sixth Amendment Rights.

SL_8494859.1

## FACTUAL BACKGROUND

Mr. Thompson was arraigned before the Court on April 24, 2025. (ECF. No. 37). Skye Larazo and Trinity Jordan were appointed as his counsel pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, that same day. (ECF. No. 41).

The Sixth Amendment to the United States Constitution guarantees accused persons the right to representation by counsel in serious criminal proceedings. This right exists regardless of an accused person's ability to pay for such representation. In 1964, the enactment of the Criminal Justice Act established a comprehensive system for appointing and compensating legal representation for individuals charged with federal crimes who are financially unable to retain counsel.

The U.S. Government has failed to adequately fund the administration of the Criminal Justice Act, resulting in a complete halt to any funding since July 3, 2025. Although CJA counsel was repeatedly assured that funding would resume in October 2025, the government has not passed a resolution allowing for temporary funding of the CJA program. The government's inability to approve the 2026 budget and the subsequent government shutdown cast a dismal shadow over any potential restoration of CJA funding.

Since the inception of the CJA program, Congress has continually authorized funding to secure representation for indigent defendants. The CJA has continued to operate without funding for over 120 days. While CJA funding has encountered brief interruptions in the past, it has never experienced such an extended lapse in funding.

Despite the government's failure to fund the defense of indigent defendants, it has made financial commitments to ensure that the prosecution of those same indigent defendants continues

uninterrupted. On October 14, 2025, the Office of Management and Budget announced that all federal law enforcement agents would continue to receive paychecks. In essence, the government has guaranteed that the prosecution side of this matter will remain fully funded, while at the same time failing to provide for the defense of indigent defendants guaranteed by the Sixth Amendment.

Although CJA funding halted across the nation on July 3, 2025, Mr. Thompson's defense counsel has not been paid for any work completed since June 30, 2025. Meanwhile, the prosecution has continued to litigate without any roadblocks or speed bumps. To-date, the prosecution has produced over *650 gigabytes* of discovery material and requested reciprocal discovery from Mr. Thompson. Such an immense production of discovery material evidences the prosecution's ability to continue pursuing this case without concern for funding and emphasizes defendant's disadvantage in reviewing the material and preparing an effective defense.

Although the funding lapse is the responsibility of neither the Court nor the prosecutors, allowing this case to move forward while the government unequally provides for the prosecution of Mr. Thompson but not his defense constitutes a sanction of constitutional imbalance. This Court retains both the power and duty to ensure the effective administration of justice within its courtroom, including a constitutional obligation to safeguard the integrity of criminal proceedings. In the interest of the constitutionally-protected justice and integrity of the criminal system, this Court can—and should—refuse to allow the prosecution of Mr. Thompson to continue absent proper funding of his defense.

Consequently, the Court should dismiss the pending charges against Mr. Thompson. In the alternative, Mr. Thompson requests that the Court order his immediate release from custody, stay any further proceedings until CJA funding is restored, and direct payment of any outstanding CJA

vouchers.

## ARGUMENT

**I.    Indigent Defendants have both Constitutional and Statutory Rights to Counsel**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right…to have the Assistance of Counsel for his defence." *Gideon v. Wainrwright* confirmed that the Sixth Amendment's guarantee to the assistance of counsel imposes on the government an obligation to provide counsel to indigent defendants: "reason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." 372 U.S. 335, 344 (1963). Further, the Sixth Amendment right to counsel includes the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits." *Evitts v. Lucey*, 469 U.S. 387, 395 (1985).

The Supreme Court's holding in *Gideon* led to the passage of the Criminal Justice Act in 1964. In addition to providing legal counsel for indigent defendants, the CJA defines representation to include the services of investigative, expert, and other services necessary for adequate representation. 18 U.S.C. § 3006A(a). The CJA expressly contemplates that private attorneys would make up a substantial proportion of the attorneys appointed (*Id*. at (b)), and that those private attorneys would be compensated for the services provided (*Id.* at (d)). The CJA was never intended to be a pro bono program.

From Mr. Thompson's arraignment in April of this year he has been deemed indigent. As

such, Mr. Thompson has, in this case, always been represented by CJA counsel. The charges brought against Mr. Thompson are serious and include the potential for life imprisonment. This case is also designated as unusual and complex within the meaning of 18 U.S.C. § 3161(h)(7)(B)(ii), as it involves multiple defendants, voluminous discovery, the need to identify and obtain evidence internationally, and the possible identification of witnesses located out of the country. A complex designation makes it highly likely that the time and resources needed to present an effective defense will far exceed that of a more typical federal criminal case.

The government's failure to pass a resolution or budget which guarantees funding for the CJA program is not a surprise—rather, major lapses in funding have been anticipated since at least April 30, 2025. *See* **Exhibit A**, April 30, 2025, Memorandum Re: Interruption of CJA Panel Payments. Initially, the Administrative Office of the United States Courts ("AO") announced that payment on CJA cases would be deferred until July 23, 2025. Now, it is uncertain when payments will be made.

Due to perpetual underfunding, this issue is set to recur shortly. Even if the government is able to pass legislation funding the judiciary's operations, the proposed 2026 budget would only provide appropriations sufficient to see the judiciary operations funded through June of 2026, without accounting for the payment that must be made on past-due obligations incurred in 2025.

The government and the judiciary have also been on notice that the government's failure to pass a resolution or budget would impact the federal courts' ability to function. On October 1, 2025, the AO reported that the judiciary would continue to perform its normal functions using court fee balances and other sources of funding. *See* https://www.uscourts.gov/data-news/judiciary-news/2025/10/01/judiciary-still-operating-shutdown-starts, last accessed October

31. The AO estimated that these provisionary funds would last for approximately two weeks, at which point the courts would operate at a more limited capacity. *Id.* On October 17, 2025, the AO announced that it would no longer have funding to sustain full operations beginning on October 20. *See* https://www.uscourts.gov/data-news/judiciary-news/2025/10/17/judiciary-funding-runs-out-only-limited-operations-continue, last accessed October 31. Currently the Court is maintaining limited operations "necessary to perform the Judiciary's constitutional functions." *Id.*

Importantly, this funding crisis has not similarly impacted the law enforcement arm of the prosecution of indigent defendants. On October 14, the Office of Management and Budget indicated they would continue to fund law enforcement in the wake of the shutdown: "OMB is making every preparation to batten down the hatches and ride out the Democrats' intransigence. Pay the troops, pay law enforcement, continue the RIFs, and wait." *See* https://x.com/WHOMB/status/1978087563211473168, last accessed October 31, 2025. In a very real way, the government has continued to provide for the prosecution of the accused, while turning a blind eye to the constitutional rights of the same.

The government's failure to fund representation of indigent defendants while simultaneously issuing paychecks to law enforcement who work to prosecute defendants constitutes much more than an inconvenience—it is an active violation of the Sixth Amendment. The Supreme Court has recognized that denying access to essential stages of the criminal process on account of indigency violates equal protection. *See Griffin v. Illinois*, 351 U.S. 12 19 (1956) ("There can be no equal justice where the kind of trial a man gets depends on the amount of money he has."); *see also Burns v. State of Ohio*, 360 U.S. 252, 258 (1959).

Likewise, Tenth Circuit holdings echo what the Supreme Court has long held about the

right to effective assistance of counsel. *See Matthews v. Price*, 83 F.3d 328, 334 (10th Cir. 1996) ("An indigent defendant may not be deprived of the tools necessary to prepare a defense."); *Anaya v. Baker*, 427 F.2d 73, 74 (10th Cir. 1970) ("That the Sixth Amendment right to counsel guarantees persons unable to obtain their own counsel the right to have counsel appointed in their behalf is a fairly fundamental proposition."); *Harris v. Champion*, 938 F.2d 1062, 1073 (10th Cir. 1991), *as modified on reh'g* (July 19, 1991) (holding that extensive systemic delays due only to defendant's status as indigent violated the defendant's constitutional right to counsel).

While it seems the federal government has not yet had to reckon with nonpayment or underpayment of defense counsel in context of the Sixth Amendment, a variety of states have. States have long recognized that substantially underpaying defense attorneys appointed to represent indigent defendants ultimately impacts the quality of the representation provided to those defendants. In Iowa, the state legislature passed code establishing fee limitations paid to public defenders for particular categories of cases. *Simmons v. State Pub. Def.*, 791 N.W.2d 69 (Iowa 2010). An attorney appointed to represent indigent defendants sought review of the state public defender's office rejection of his request for fees exceeding the statutory fee cap. *Id.* Lower courts rejected his petition for fees exceeding the fee cap. *Id.* The Iowa Supreme Court ultimately reversed and remanded the decision of the district court, holding that "issues of a defendant's right to effective assistance of counsel and an attorney's right to fair compensation are inextricably linked." *Id*. at 84 (citation omitted).

Likewise, the Supreme Court of Appeals of West Virginia has held that underpayment of counsel appointed to represent indigent defendants was also a violation of the Sixth Amendment. *Jewell v. Maynard*, 383 S.E.2d 536, 544 (1989) (concluding that indigent clients are the ones to

7

suffer the consequences of underpayment and that it is "unrealistic to expect all appointed counsel with office bills to pay and families to support to remain insulated from the economic reality of losing money each hour they work.")

Similarly, the Florida Supreme Court has ruled that certain statutes imposing fee caps on compensation for an attorney's representation of an indigent criminal defendant were unconstitutional. *Makemson v. Martin Cnty.*, 491 So. 2d 1109 (Fla. 1986) ("When the United States Supreme Court, in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), found fundamental the right to effective counsel and established the state's duty to provide representation to the indigent, it by no means intended to place the weight of this duty upon the shoulders of a few individual practitioners appointed by the court. The system as it presently stands forces these individuals, in the most difficult cases, to bear a burden which is properly the state's with only token compensation for their efforts.")

It is hardly an argument to say that perpetual nonpayment of appointed counsel is a more grievous violation of the Sixth Amendment than underpayment. Although "present in name," the undersigned—without any financial support against a fully-funded prosecution—is rendered effectively unable to provide the constitutionally required representation to Mr. Thompson. To argue otherwise is to explicitly advocate for a two-tiered system where the prosecution is provided with limitless resources while the indigent defendant must resort to hoping that his appointed counsel is willing to continue representation out of the goodness of his heart. The Constitution mandates a criminal justice system where all have access to effective representation regardless of income, not a pay-to-play experience where justice is located behind a paywall.

## **CONCLUSION**

For the reasons listed above, Mr. Thompson respectfully requests that this Court dismiss the pending charges against him, or, in the alternative, that the Court order his immediate release from custody, stay all proceedings until CJA funding resumes, and instruct that payment on outstanding CJA vouchers must be made.

DATED: November 4, 2025.

**DENTONS DURHAM JONES PINEGAR**

/s/ *Trinity Jordan*
Trinity Jordan
Jacob R. Lee

**RAY QUINNEY & NEBEKER, P.C.**

/s/ *Skye Larazo*
Skye Larazo

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I, Molly Mallard, certify that on this 4th day of November, 2025, I caused a true and correct copy of the foregoing to be served via CM/ECF on counsel for all parties of record herein.

/s/   *Molly Mallard*